Robert W. Sadowski
Raphael Katz
SADOWSKI FISCHER PLLC
39 Broadway, Suite 1540
New York, New York 10006
Tel. No.: (212) 913-9678

David S. Abramson
Adina T. Glass
THE ABRAMSON LAW GROUP PLLC
570 Lexington Avenue
New York, NY 10022
(212) 686-4401

Attorneys for Relator John Doe

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA; *ex rel.* John Doe,<br><br>         Plaintiff,<br><br>- against -<br><br>COMMERZBANK AG; COMMERZBANK AG, NEW YORK BRANCH; COMMERZBANK AG, GRAND CAYMAN BRANCH; and COMMERZBANK AG, LUXEMBOURG BRANCH,<br><br>         Defendants. | **AMENDED COMPLAINT**<br><br>**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>Civ. No. 13 cv. 8095 |

On behalf of the United States of America, Relator John Doe ("Relator"), by and through Relator's attorneys Sadowski Fischer PLLC and the Abramson Law Group PLLC file this *qui tam* action against Commerzbank AG ("CBK") Commerzbank AG, New York Branch (the "New York Branch"), Commerzbank AG, Grand Cayman Branch

(the "Cayman Branch"), and Commerzbank AG, Luxembourg Branch (the "Luxembourg Branch) (collectively "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1.　　The United States has imposed strong sanctions on Iran and Cuba since the 1980s and the 1960s respectively. Prevented from doing business directly with numerous companies and countries affiliated with the United States, Iran turned to the gold trade to evade the effects of the sanctions. Defendants secretly were the leading trader of gold with the Central Bank of Iran, which brought Iranian gold trading to the United States in numerous ways, including via disguised orders passed through its New York Branch. Defendants also engaged in numerous foreign exchange trades with Cuban banks. At the same time, and without disclosing these acts, Defendants unlawfully borrowed at least $350 million dollars from the Unites States through the Federal Reserve Bank.

2.　　This is a *qui tam* action brought on behalf of the United States of America under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* The Relator seeks to recover treble damages and civil penalties on behalf of the United States of America arising from the conduct of Defendants who: made, used, or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the United States of America; all in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") by unlawfully securing at least a $350 million dollar loan from the Unites States by misrepresenting themselves and failing to disclose their involvement in the Iranian gold trade.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §§ 1331 (Federal question), and 1345 (United States as plaintiff).

4. Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) (1) and (2), because Defendants reside or transacts business in the Southern District of New York, and/or an act proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

5. This action is not jurisdictionally precluded by the public disclosure bar of the False Claims Act, 31 U.S.C. § 3730(e) (4). Through Relator's interactions with various employees of the Defendant and other persons, Relator has "direct and independent knowledge" of the instant allegations. In addition, Relator has "voluntarily provided," and offered to provide, this information to the Government before the filing of this complaint. Therefore, to the extent any of these allegations are deemed to have been based upon a public disclosure, Relator is an "original source" of this information within the meaning of the False Claims Act, and is expressly exempted from the public disclosure bar.

## THE PARTIES

6. Plaintiff is the United States of America. The United States is a real party in interest in this action because the United States through its agency, the Federal Reserve was damaged by the acts of the defendants.

7. Relator John Doe is a former employee of Commerzbank Capital Markets Corporation ("CCMC"), Commerzbank Securities and CBK.

8. Defendant CBK is a German global banking and financial service company with its headquarters in Frankfurt, Germany. It is the second largest German bank. It is involved in the trade of physical and non-physical precious metals, including gold, on a 24 hour-basis through its Luxembourg, New York, and Singapore branches. It also markets itself as a "leading trader of physical gold."

9. Defendant the New York Branch is a wholly owned subsidiary of CBK.

10. Defendant the Cayman Branch is a wholly owned subsidiary of CBK.

11. Defendant the Luxembourg Branch is a wholly owned subsidiary of CBK. Prior to 2010, the branch operated as Commerzbank International S.A., also a wholly owned subsidiary of CBK.

12. CBK has three main businesses: (i) retail banking, confined largely to Germany, (ii) commercial and mortgage banking on a world-wide basis, and (iii) investment banking.

13. CCMC is a former New York corporation that was a wholly-owned subsidiary of CBK. Due to a reorganization, the Cayman Branch assumed the liabilities of CCMC. However, the Cayman Branch has no physical presence in the United States and is managed by the New York Branch.

## THE LAW

### The False Claims Act

14. The FCA, specifically 31 U.S.C. § 3729(a)(1) and (2), imposes liability upon any person who: "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement to get false or fraudulent

4

claims paid or approved." Any person found to have violated these provisions is liable for a civil penalty of up to $11,000.00 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

15. The FCA imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and "no proof of specific intent to defraud is required." 31 U.S.C. § 3729. The FCA also broadly defines a "claim" as including "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

**Regulations and Laws Pertaining to Sanctions Against Iran**

16. The U.S. Department of the Treasury through its Office of Foreign Assets Control ("OFAC") administers the sanctions program under the Iranian Transactions Regulations, 31 C.F.R. Part 560, and the Iranian Assets Control Regulations, 31 C.F.R. Part 535.

17. As a result of Iran's support for international terrorism and its aggressive actions against non-belligerent shipping in the Persian Gulf, President Reagan, on October 29, 1987, issued Executive Order 12613 imposing a new import embargo on Iranian-origin goods and services. Section 505 of the International Security and Development Cooperation Act of 1985 ("ISDCA") was utilized as the statutory authority for the embargo, which gave rise to the Iranian Transactions Regulations, Title 31, Part 560.

18. Effective March 16, 1995, as a result of Iranian support of international terrorism and Iran's active pursuit of weapons of mass destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum in Iran. On May 6, 1995, President Clinton signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA") as well as the ISDCA, substantially tightening sanctions against Iran.

19. On August 19, 1997, President Clinton signed Executive Order 13059 clarifying Executive Orders 12957 and 12959 and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, are prohibited.

20. U.S. persons, including foreign branches of U.S. depository institutions and trading companies, are prohibited from engaging in any transactions, including purchase, sale, transportation, swap, financing, or brokering transactions related to goods or services of Iranian origin or goods or services owned or controlled by the Government of Iran. New investments by U.S. persons, including commitments of funds or other assets, loans or any other extensions of credit, in Iran or in property (including entities) owned or controlled by the Government of Iran are also prohibited. *See* 50 U.S.C. §§ 1701 *et seq.*, Executive Orders 12957, March 15, 1995, 12959, May 6, 1995, 13059, August 19, 1997; 31 C.F.R. §§ 560.203, 560.207, 560.208, 560.319, 560.412, 560.416, 560.417, 560.701.

21. These prohibitions are designed, according to the United States Treasury Department, to prevent Iran's financing of international terrorism, development of nuclear weapons and interference with sea traffic in international waters in the Strait of Hormuz.

**Regulations and Laws Pertaining to Sanctions Against Cuba**

22. Beginning with Executive Orders issued in 1960 and 1962, which found that the actions of the Government of Cuba threatened U.S. national and hemispheric security, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations. Pursuant to the Trading with the Enemy Act ("TWEA"), 12 U.S.c. § 95a *et seq.*, OFAC has promulgated a series of regulations that prohibit virtually all financial and commercial dealings with Cuba, Cuban businesses, and Cuban assets.

## FACTS

*The Gold trade has been Integral to Iran's Evasion of the Economic Effect of* Sanctions

23. Over the years, Iran increasingly traded gold through buying, selling, lending, and bartering because financial sanctions have prevented the Iranians from using conventional bank payment methods in trading with numerous companies and countries.

24. Therefore, the gold trade has been essential to Iran's withstanding the increasingly restrictive U.S. sanctions. It has a substantial amount of gold reserves, amounting to $112 billion in gold, which it accumulated in part by trading oil for gold. It used gold to preserve its wealth especially to withstand the devaluation of its currency and to engage in trading that would bypass U.S. sanctions.

*Commerzbank's Scheme to Trade Gold with and on Behalf of the Central Bank of Iran and to aid it in Evading U.S. Sanctions*

25. Starting no later than 2002, CBK engaged in unlawful gold transactions with and on behalf of the Central Bank of Iran. According to CBK precious metal traders, CBK had "the lion's share" of Iranian gold trading and was the largest counterparty to the Central Bank of Iran's gold trading.

26. CBK is one of the top three global gold bullion traders and a member of the London Bullion Marketing Association.

27. CBK conducts its precious metals trading through its Luxembourg branch. However, because it facilitates trading on a 24-hour basis, it also operates through its Singapore and New York branches. Therefore, orders were necessarily and admittedly passed through the New York Branch because the Luxembourg branch did not remain open through the close of the American trading session. This led to CBK unlawfully trading with Iran through the New York Branch, including by passing disguised orders through the New York Branch.

28. CBK is the only international bank to use Luxembourg as its central location for precious metals trading, rather than a city like London, which is a center of precious metal trading. CBK traders said the reason for this was to keep government eyes off of their trading with Iran.

29. Defendants targeted American customers and attempted to use Relator and his connections to expand their liquidity, thus enabling possible disguised Iranian gold trading to his customers, such as U.S. hedge funds and other American financial institutions. Therefore, Defendants also unlawfully involved unsuspecting American customers in illegal Iranian gold trading. Relator refused to cooperate and Defendants terminated him for not cooperating with its scheme.

30. CBK engaged in unlawful gold trading on behalf of and with the Central bank in several ways. Some of these transactions, likely often disguised by use of CBK, Commerzbank, Luxembourg Branch, or a dummy entity as the apparent other party, upon information and belief, directly involved the Iranian Central Bank as the real beneficiary

of the transactions. Others had the effect of subsidizing CBK's overall precious metals operation which materially benefited the Central Bank of Iran. A third category were transactions intended to support CBK's precious metals operation including its Iranian trading by providing hedges, such as through trades in gold futures contracts on the U.S. Commodities Exchange and transactions in U.S securities on the New York Stock Exchange in precious metals Exchange Traded Funds such as "GLD." Commerzbank's Unlawful $ 350 Million Loan from the Federal Reserve Bank

### *Commerzbank's Scheme to Trade with Cuba to aid it in Evading U.S. Sanctions*

31. Starting no later than January 2006, Defendants made no less than 593 US dollar foreign exchange trades with Cuba's Banco de Financiero Internacional.

32. Defendants maintained no internal controls to prevent such unlawful trades.

### *Commerzbank's Unlawful $ 350 Million Loan from the Federal Reserve Bank*

33. In response to the financial crisis, on August 17, 2007, the Federal Reserve introduced the Term Discount Window Program, which allowed banks to borrow from the Federal Reserve discount window for periods longer than overnight.

34. On August 20, 2007, CBK became the first foreign bank to take advantage of this money available from the Federal Reserve, and its New York branch borrowed $350 million from the Federal Reserve Bank of New York.

35. However, Defendants failed to disclose in their loan application or otherwise, that they had, and upon information and belief, continued to trade gold with and on behalf of the Central Bank of Iran and engage in US dollar trades with Cuba. It further impliedly and expressly certified compliance with the rules and regulations

governing sanctions on Iran and Cuba as well as other regulations and statutes that prohibited its activities.

36.    In the very same month that Defendants received the loan, they made at least five US dollar foreign exchange spot trades with Banco de Financiero Internacional, including one on August 20, 2007, the very same day they received the $350 million loan. From January 2006 through August 20, 2007, Defendants made 387 US dollar trades with Banco de Financiero Internacional.

37.    Had the Government known of Defendants' involvement in Iranian gold trading and trading with Cuba, it would never have loaned it the $350 million, let alone on an emergency basis during the Financial Crisis. Therefore, Defendants fraudulently received the benefits of the loan from the United States.

## FIRST CLAIM

False Claims Act: Presentation of False Claims
(31 U.S.C. § 3729(a) (1) (A))

38.    Relator re-alleges and incorporates by reference herein the allegations previously alleged.

39.    The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

40.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the application for the $350 million loan from the Federal Reserve Bank of New York.

41.    The United States paid Defendants because of Defendants' fraudulent conduct.

42. By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

43. By engaging in the conduct described in the foregoing Paragraphs, Defendants have violated the False Claims Act.

## SECOND CLAIM

Using False Records or Statements
(31 U.S.C. § 3729(a) (1) (B))

44. Relator re-alleges and incorporates by reference herein the allegations previously alleged.

45. The United States seeks relief against Defendants under Section § 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. 3729(a)(1)(B).

46. Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims, in connection with the submission of its loan application

47. The United States paid such false or fraudulent claims because of Defendants' acts and conduct.

48. By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

49. By engaging in the conduct described in the foregoing Paragraphs, Defendants have violated the False Claims Act.

## THIRD CLAIM

False Claims Act: Making or Using False Record
or Statement to Avoid an Obligation to Refund
(31 U.S.C. § 3729(a) (1) (G))

50. Relator re-alleges and incorporates by reference herein the allegations previously alleged.

51. The United States seeks relief against Defendant under Section § 3729(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

52. Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in connection with the submission of the loan application of the Federal Reserve Bank of New York.

53. Defendants failed to pay or transmit money due to the United States because of Defendants' acts and conduct.

54. By reason of the Defendants' use of false statements, the United States has been damaged in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government demands judgment against the above-named Defendants, ordering that:

    a.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained as a result of Defendants' actions, which Relator currently estimates to be in the hundreds of millions of dollars; plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729 *et seq.*, or such other penalty as the law may permit and/or require for each violation of other laws which governed Defendants' conduct.

    b.    Relator be awarded a relator's share of the judgment to the maximum amount provided pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

    c.    Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law;

    d.    Relator and the United States be awarded such other and further relief as the Court may deem to be just and proper.

## JURY TRIAL IS DEMANDED

Dated: New York, New York
      August 7, 2014

SADOWSKI FISCHER PLLC

By: _____
    Robert W. Sadowski
    Raphael Katz
    39 Broadway, Suite 1540
    New York, NY 10006
    rsadowski@sflawgroup.com
    rkatz@sflawgroup.com

THE ABRAMSON LAW GROUP PLLC
570 Lexington Avenue
New York, NY 10022

David S. Abramson
Adina T. Glass

*Attorneys for Relator John Doe*

TO:
United States Attorney
for the Southern District of New York
86 Chambers Street
New York, New York

Attorney General
Civil Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

14